**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**CIVIL ACTION NO. 08-621-JBC**

**THOMAS FRENTZ,**
**Trustee for Cynthia Rodgers,**                                             **PLAINTIFF,**

**V.**                                    **MEMORANDUM OPINION AND ORDER**

**CITY OF ELIZABETHTOWN, et al.,**                                    **DEFENDANTS.**

* * * * * * * * * * *

This matter is before the court upon the motions of the defendants, City of

Elizabethtown, Mayor David Willmoth, Jr., in his individual and official capacities, and

William Owen, in his individual and official capacities, for summary judgment. R. 50

and 51. For the following reasons, the motions will be granted in part and denied in

part.

**I.       Background**

This suit arises from Cynthia Rodgers's employment at, and termination from,

the Public Works Department of the City of Elizabethtown, Kentucky ("the City").

Rodgers was employed by the City from September, 1989, until November 27, 2007,

when she was discharged. Rodgers contends that she was subjected to discrimination,

harassment, and a hostile work environment and was ultimately discharged in

retaliation for ending and attempting to report her sexual relationship with her

supervisor, William Owen.

1

The relevant facts, viewed in a light most favorable to the plaintiff, are as follows: Between 2003 and 2004, Owen routinely propositioned Rodgers while at work. During this period, Rodgers and Owen engaged in various sexual activities in the workplace. R. 15, at ¶¶ 8, 30. The first encounter occurred at a job site sometime in 2003 when Owen kissed Rodgers. According to Owen, Rodgers was "shocked" when he did this. Following this first incident, Owen admitted to physically touching Rodgers's body while at the office, including her breasts and genitals. Rodgers testified that she sometimes asked him to stop, but that he would not always do so. Rodgers Dep. at 106.

In addition to this physical contact, Owen also made various inappropriate statements to Rodgers. These included requests for sexual intercourse and fellatio. Owen joked that these acts were part of her job description. *Id.* at 109. Rodgers also recalls Owen stating that "if [she] went along with everything he would make things easier on [her] and if [she] didn't, he could make them harder on [her]." *Id.* at 111. Rodgers's complaint also indicates that Owen and other co-workers told sexually-charged jokes in Rodgers's presence. Although Rodgers does not recall the exact content of these jokes, she heard them and says that they involved "touching of women's breasts and whether a woman was good in bed." *Id.* at 112.

In August 2004, Rodgers told Owen that the sexual conduct had to stop. Although Owen's advances did stop at that point, Rodgers claims that he became hostile toward her. *Id.* at 144. As examples of this, she points to three statements made by Owen. One was a comment that she should be "barefoot and pregnant." Another was calling her a "dumb blonde," and the third was a remark to Rodgers that a female

job applicant was prettier than she. *Id.* at 145-46. In addition, Owen (in conjunction with Charlie Bryant, another supervisor) limited Rodgers's ability to work overtime sometime after she terminated their sexual relationship.

Although Rodgers repeatedly tried to complain about Owen's conduct, there is no indication that anyone other than Owen was actually aware of what was occurring. *Id.* at 1-2. Rodgers asserts she "tried to bring []up" Owen's behavior to Mike Reynolds, her direct supervisor,  but was unable. *Id.* at 60-62, 90. *See also* R. 56 at 9. When asked directly, she conceded that she never told Reynolds that she was being harassed. Rodgers Dep. at 60, 62.

The defendants argue that Rodgers was fired because of her poor work performance. Rodgers admits to numerous difficulties related to absenteeism and tardiness. She was often late for work, Rodgers Dep. at 34, would oversleep, *id.* at 27, and sometimes did not show up for work on Mondays. *Id.* at 23-27, 44. Further, she admitted receiving numerous verbal and written warnings about this behavior. *Id.* at 34-36, 40-45. Rodgers also had a problem with alcohol abuse. *Id.* at 37-39. Her supervisors warned her that they believed it was having an effect on her work and reprimanded her for appearing in public wearing the City logo while intoxicated. *Id.* at 38-44.

Rodgers was fired on November 27, 2007. On that day, she went to see Mayor Willmoth. Upon entering his office, she stated, "I need to talk to you and I've been needing to talk to you for a long time," to which he replied, "[I]t doesn't matter what you say, you're terminated." Rodgers Dep. at 28. Willmoth also stated that he was firing

Rodgers because of her excessive absenteeism. After that, Rodgers offered to "do whatever you want me to do" including take a suspension, but that Willmoth "just wouldn't listen to me." Rodgers then stated "You don't know what, what Bill's done," but Willmoth wouldn't listen.  Rodgers Dep. at 28.

## II.    Legal Analysis

 As an initial matter, Rodgers brings numerous discrimination and sexual harassment claims against Willmoth and Owen individually that fail as a matter of law. Individuals cannot generally be held personally liable for violations of Title VII or the KCRA's discrimination, sexually hostile work environment, or quid pro quo sexual harassment provisions.  R. 55, at 1-2.  *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 794 (6th Cir. 2000).  Nonetheless, Willmoth and Owen may be individually liable if Rodgers can prove retaliatory conduct in violation of Ky. Rev. Stat. § 344.280.  *Id.*

### A.    Violation of 42 U.S.C. § 1983 - Freedom of Speech

Rodgers claims that she was fired as punishment for exercising her freedom of speech, namely by attempting to report the sexual harassment and misconduct perpetrated by Owen. However, Rodgers's claim fails because she never actually engaged in any constitutionally protected speech. *See Baker v. McCollan*, 443 U.S. 137, 140 (1979)*; Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)*.* By her own admission, she did not report Owen's sexual harassment to Willmoth.  The language of her second amended complaint is telling: "On or about November 27, 2007, Ms. Rodgers *attempted* to file a complaint asserting that Defendant Owen had subjected Ms. Rodgers to intentional, deliberate, highly offensive, and unwelcome acts of a sexual

4

nature." R. 14, at ¶ 20 (emphasis added). *See also* R. 56 at 15-16 ("Rodgers engaged in constitutionally protected speech when she *attempted* to inform Willmoth on 'matters of public concern' . . . Rodgers's *attempt* to report . . . was a substantial and motivating factor.") (emphasis added).

Rodgers's deposition also sheds light on the insufficiency of her prima facie case. When asked whether she mentioned that she had been sexually harassed during the November 27, 2007, meeting in which Willmoth terminated her, she responded, "Not directly, I tried, but he wasn't going to listen to me." Rodgers Dep. at 28; *see also* 29 (admitting that she had not told Willmoth, by the time he terminated her, that she had been sexually harassed). All Rodgers stated was, "I need to talk to you and I've been needing to talk to you for a long time." When asked specifically whether she had ever told Willmoth that she was being sexually harassed or harassed "in any way," she repeatedly answered in the negative. *Id.* at 63-65. Even after being terminated, the closest she came to reporting any harassing behavior was stating "[y]ou don't know what, what Bill's done." See Rodgers Dep. at 28-29. This is not a sufficient showing.

Because there are no genuine issues of material fact with respect to Rodgers's § 1983 claims, the defendants are entitled to summary judgment. Fed. R. Civ. P. 56(c).

**B.    Gender or sex discrimination under Title VII and the KCRA**

Rodgers also alleges that she was treated differently than her male colleagues, in violation of both Chapter 344 of the KCRA and Title VII. R. 14, at ¶¶ 26-30, 51-55. Because the analysis is the same under both statutes, this court will consider them together. *McBrearty v. Ky. Cmty. & Technical Coll. Sys.*, 262 S.W.3d 205, 213 n.11

(Ky. Ct. App. 2008) (citing *Bank One v. Murphy*, 52 S.W.3d 540, 544 (Ky. 2001))

("Kentucky courts consider the decisions of federal courts that interpret Title VII as persuasive precedent when interpreting Ky. Rev. Stat. Ch. 44 due to the similarity between Title VII of the Civil Rights Act of 1964 and Kentucky's Civil Rights Act.").  For the reasons discussed below, Rodgers has not carried her burden to rebut the defendants' articulated bases for their actions. Therefore, the defendants are entitled to summary judgment.  Fed. R. Civ. P. 56(c).

Rodgers alleges that she was treated differently  than male employees in the terms and conditions of her employment, based on the City's limiting her ability to use sick leave and personal leave and terminating her employment. For the purposes of their summary judgment motion, the defendants have conceded that the plaintiff could make out a prima facie claim of gender discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Defendants must next articulate a non-discriminatory basis for their decisions.

The defendants have articulated a legitimate, nondiscriminatory basis for their actions: Rodgers's absenteeism, tardiness, and poor work performance. Thus, the burden shifts back to Rodgers to rebut the defendants' justifications and show that they were pretextual. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Rodgers has failed to do so. She offers no evidence that those issues did not exist or did not actually motivate her termination, nor does she argue that the City's proffered reasons are insufficient to justify termination.

Rodgers alleges generally that she was treated differently than other male

employees "who were subject to the City of Elizabethtown's sick and personal leave policy's."  R. 56 at 18, 20.  However, Rodgers's subjective belief that she was terminated because of her gender is not sufficient to carry her burden of demonstrating that the City's legitimate reasons were pretextual. Her only evidence on this point is the generally subjective nature of the sick leave policy and her own testimony that a fellow male employee (Mr. Bohannon) accumulated negative sick leave once as well, but was not fired. This is wholly insufficient to rebut the defendants' nondiscriminatory basis. There is no evidence that Mr. Bohannon was similarly situated to Rodgers, *see Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir.1992)*,* because Rodgers has not claimed or demonstrated that Mr. Bohannon shared her problems of absenteeism, tardiness, and poor work performance.

In sum, Rodgers has produced no proof of pretext. Because she is unable to carry her burden of "produc[ing] sufficient evidence from which the jury may reasonably reject the employer's explanation," the court will grant summary judgment on her claim of sexual discrimination. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387 (6th Cir, 2008); *Wilson v. Dana Corp.*, 210 F. Supp. 2d 867, 887 (W.D. Ky. 2002). *See also* Fed. R. Civ. P. 56(c).

## C.    Retaliation under the KCRA and Title VII

Rodgers also alleges retaliation under both the KCRA and Title VII.[1] Because

---

[1]Although Rodgers did not substantively argue that Owen is individually liable for  retaliation, she did refer this court to her response to the other defendants' motion for summary judgment, and reserved the right to file a surreply. Because no surreply was filed, the court incorporates by reference the facts and arguments set forth by Rodgers, specifically at R. 56.  *See* Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion."); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure Civil* § 1326

Rodgers cannot rebut the defendants' legitimate, nondiscriminatory basis for their actions, the defendants are entitled to summary judgment on Rodgers's retaliation claims. Fed. R. Civ. P. 56(c).

As discussed earlier, Willmoth and Owen cannot be held individually liable for retaliation under Title VII. *Morris v. Oldham Co. Fiscal Ct.*, 201 F.3d 784, 794 (6th Cir. 2000). Although the two statutes are very similar, their language varies in one important aspect: Ky. Rev. Stat. § 344.280(1) makes it unlawful for "a person. . . to retaliate or discriminate in any manner," while 42 U.S.C. § 2000e-3(a) forbids retaliation by "an employer." Because Rodgers does not allege that Willmoth and Owen fall within the definition of "employer," although expressly averring that the City does meet that definition, a Title VII action cannot be maintained against Willmoth and Owen. *Sharma v. Ohio State Univ.*, 25 F.App'x 243, 246 (6th Cir. 2001). Nonetheless, Willmoth and Owen can be held individually liable under § 344.280. *Morris*, 201 F.3d at 794 (indicating that individual liability is permissible under § 344.280). Apart from this distinction, however, the two statutes are interpreted identically, and "Kentucky courts consider the decisions of federal courts that interpret Title VII as persuasive precedent when interpreting Ky. Rev. Stat. Ch. 44." *McBrearty v. Ky. Cmty. & Technical Coll. Sys.*, 262 S.W.3d 205, 213 n.11 (Ky. Ct. App. 2008) (citing *Bank One v. Murphy*, 52 S.W.3d 540, 544 (Ky. 2001)).

To survive summary judgment, Rodgers must make a prima facie showing of retaliation. The first step in her prima facie case requires Rodgers to establish that she

---

(3d ed. 2010).

8

engaged in protected activity. *Morris*, 201 F.3d at 794. In her complaint, she alleges that she engaged in protected activity when she: "(1) refused to comply with Defendant Owen's demands for sexual acts in or about August 2004; and (2) attempted to complain to Defendant Willmoth of sexual harassment and sex discrimination perpetrated by Defendant Owen on or about November 27, 2007." R. 14, at ¶¶ 47, 58.

Rodgers has provided sufficient facts to meet this first requirement. Although Rodgers's "attempt" to complain to Willmoth does not amount to protected activity, she was engaged in a protected activity when she rejected Owen's sexual advances. Neither Kentucky courts nor the Sixth Circuit have specifically addressed whether Rodgers's rejecting Owen's sexual advances constitutes engaging in a protected activity. District courts within the Sixth Circuit have disagreed. *See Berthiaume v. Appalachian Christian Vill. Found., Inc.*, No. 2:07-CV-46, 2008 WL 4138112, at *4 (E.D. Tenn. Sept. 4, 2008) (finding that a plaintiff who rejected a supervisor's sexual advances met the first element of her prima facie case of retaliation); *Reed v. Cracker Barrel Old Country Store, Inc.*, 133 F. Supp. 2d 1055, 1070 (M.D. Tenn. 2000) (same). *Cf. Walter v. Zoological Soc'y of Cincinnati*, No. 1:05-CV-327, 2007 WL 527872, at *6 (S.D. Oh. Feb. 14, 2007) (holding that plaintiff had not engaged in protected activity by objecting to supervisor's offensive behavior because the supervisor was not likely to report her objection to management). Circuit courts are also split on the question. *Compare Le Marie v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 389 (5th Cir. 2007) (affirming a grant of summary judgment for an employer where the employee's only arguably protected activity was rejecting her supervisor's sexual advances) *with Ogden*

*v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (finding that a woman who told her supervisor to stop harassing her had engaged in the most "basic form of protected conduct"). This court agrees with the judgment and reasoning of the Eighth Circuit in *Ogden*. Therefore, viewing the facts in a light most favorable to the plaintiff, Rodgers was engaged in protected activity when she terminated her relationship with Owen.

For the second step in her prima facie case, Rodgers must show that the decision-maker had knowledge of her protected activity. As explained above, Rodgers has conceded that Willmoth had no knowledge of her relationship with Owen, let alone her termination of it. On the other hand, Owen certainly knew that Rodgers had explicitly put an end to their sexual encounters, so, to the extent that her rebuffing his advances is protected activity, Owen (who was her supervisor) had knowledge of it. Rodgers has thus met the second element of her prima facie case.

For the third step in her prima facie case, Rodgers must show that she was subjected to adverse employment action or to severe and pervasive retaliatory harassment. *Akers v. Alvey*, 338 F.3d 491, 497-98 (6th Cir. 2003); *Morris*, 201 F.3d at 784. As proof of this element, Rodgers alleges that Owen denied her overtime and brought her attendance to Bryant and Willmoth's attention in retaliation for her ending their relationship.  R. 56, at 33-34; R. 14, at ¶ 13.  She further complains that after she ended the sexual contact with Owen, he made "retaliatory comments" to her and mentioned the appearance of another woman.  R. 56, at 33.

Owen's bringing Rodgers's attendance issues to the attention of management personnel was not sufficiently extreme to amount to a change in the terms and

conditions of Rogers's employment.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  In fact, the reporting did not constitute a change in her employment at all; that it later may have contributed to her termination does not mean the reporting itself constituted adverse employment action.

Neither was Rodgers subjected to "severe and pervasive retaliatory harassment." She claims that Owen became "very critical of her work and controlling of her activities, [and] very hostile towards [her] and continued to make sexist comments to her in front of other co-workers," R. 14, at ¶ 13. *See also Morris*, 201 F.3d at 798 (noting that the harassing conduct need not be overtly sexual, so long as it would not have occurred, but for plaintiff's gender). However, Rodgers could describe only a handful of examples of such behavior, and her allegations are non-specific. For instance, she vaguely alleges that "he yelled at me several times."  *See Walter*, 2007 WL 527872, at *6. Rodgers also recalls crude jokes and Owen's saying she should be barefoot and pregnant, calling her a dumb blonde, and remarking that other job applicants were prettier than she.  Rodgers Dep., 111-12, 145-46.  Such facts, even viewed in a light most favorable to the plaintiff, are not sufficient to alter the conditions of the plaintiff's employment and create an abusive working environment. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993); *Hollins v. Atl. Co.,* 188 F.3d 652, 662 (6th Cir.1999). *See also Broska v. Henderson*, 70 F.App'x 262, 268-70 (6th Cir. 2003) (compiling numerous cases to examine this factor, and noting that Title VII was not meant to be a "general civility code"); *Austion v. City of Clarksville*, 244 F.App'x 639, 653 (6th Cir. 2007).

On the other hand, the decision to terminate Rodgers constitutes an adverse

employment action,[2] as does the decision to reduce her permitted overtime hours. *See Lentz v. City of Cleveland*, 333 F.App'x 42 (6th Cir. 2009). Hence, plaintiff has met the third element of her prima facie case.

Nonetheless, even though Rodgers can prove the first three elements of her prima facie case, the plaintiff has not provided "evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action." *Nguyen*, 229 F.3d at 566. "In most cases, this requires proof that (1) the decision maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made, and (2) there is a close temporal relationship between the protected activity and the adverse action." *Brooks*, 132 S.W.3d at 804.

Rodgers has demonstrated no causal relationship between the protected activity (ending the relationship) and the adverse employment action (her termination and reduced overtime). As for the termination, there is no evidence that Willmoth, the decision maker in question, was aware of her relationship with Owen or her decision to terminate the relationship. Further, the decision to fire Rodgers was made several years after she ended her relationship with Owen. Hence, her termination cannot supply the necessary fourth element of her prima facie case, such that the decision to terminate her cannot serve as a basis for a retaliation claim.

The decision to limit her overtime presents a closer question. To establish a

---

[2]Although the sequence of events is especially relevant to the fourth element of plaintiff's prima facie case, it is worth noting that the third element in *Morris* specifically requires that the defendant learn of the protected activity and *thereafter* take an adverse employment action. Because Willmoth did not know of plaintiff's activity until after he took the adverse employment action, her termination fails to meet the third prong of her prima facie case.

causal connection, Rodgers must produce sufficient evidence from which one could draw an inference that Owen would not have limited her overtime had she not cut off their sexual relationship. *See Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003).

There is no evidence of a close temporal relationship between Rodgers's termination of her relationship with Owen and the decision to limit her overtime. Although Owen admits that he (in conjunction with another supervisor) denied Rodgers's overtime work sometime after their relationship ended, *see* Owen Dep. at 140-42, neither side has suggested when this occurred.[3] Rodgers has failed to establish a time frame for the pertinent events that would allow a jury to reasonably conclude that there was a causal nexus between her complaints and adverse employment action. *See Arendale v. City of Memphis*, 519 F.3d 587, 606-07 (6th Cir. 2008) (indicating that the mere fact that the allegedly retaliatory actions took place two months after the filing of a charge of discrimination did not by itself support the causal connection element); *Jones v. Kroger Inc.*, No. Civ.A. 504-543-JMH, 2005 WL 2807194, at *5 (E.D. Ky. Oct. 27, 2005) ("Plaintiff must provide additional evidence to create an inference that she would not have been suspended and terminated if she had not complained to her managers about her co-employee's racist remark."). Here, far from establishing a close temporal relationship, Rodgers does not even specify when her overtime work was limited.

---

[3]The parties indirectly indicate Rodgers's overtime reduction occurred after the 2005-2006 period (given that Rodgers apparently used overtime to offset her negative sick leave accumulated during this period). Owen Dep. at 60-64; R. 56 at 6, 13.

Even viewed in conjunction with the crude jokes and insensitive comments allegedly made by Owen, there is still no indication of a retaliatory animus toward Rodgers. She has provided no evidence that any of these actions would not have been taken absent her decision to terminate her relationship with Owen, *Nguyen*, 229 F.3d at 563, or that they were done in order to retaliate against her. *Jones*, 2005 WL 2807194 at *5. Even giving Rodgers the benefit of all inferences in her favor, and assuming the reduction in overtime occurred close in time to August 2004, as described above, "temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Arendale* at 606 (citing *Nguyen*, 229 F.3d at 563).

Assuming that Rodgers could prove her prima facie case, this court would engage in the burden-shifting analysis articulated in *Balmer v. HCA, Inc.*, and arrive at the same result – that the defendants articulated a legitimate, non-discriminatory justification for reducing her overtime and terminating her, and that Rodgers cannot demonstrate any facts indicating that these were a pretext for discrimination. 423 F.3d 606 (6th Cir. 2005).

The defendants' articulated basis, Rodgers's tardiness and absenteeism, is a legitimate reason for limiting her overtime. Hence, Rodgers must show that this was merely a pretext for retaliation. In order to show pretext, she must show that "that the non-discriminatory reason for [the decision to limit her overtime] had no basis in fact, that it did not actually motivate the employer's decision to terminate the employee, or that it was insufficient to motivate the decision to terminate the employee." *Armstrong v.*

*Whirlpool Corp.*, 363 F.App'x 317, 330. Rodgers has not produced any such evidence. Thus, the defendants are entitled to summary judgment on Rodgers's retaliation claims as well. *See Wright v. Murray Guard, Inc.,* 455 F3d 702, 708-709 (6th Cir. 2006). *See also* Fed. R. Civ. P. 56(c).

### D. Hostile work environment/sexual harassment under KCRA

The plaintiff also brings a claim for discriminatory work environment under the KCRA. She asserts that "Owen's intentional, deliberate, and unwelcome acts of a sexual nature" were so severe and pervasive that they altered the conditions of her employment and otherwise created a sexually hostile working environment. R. 14, at ¶¶ 31-37. *See Meritor Sav. Bank, FSV v. Vinson et al.*, 477 U.S. 57, 67 (1986). For the reasons discussed below, the court will deny the defendants' motion for summary judgment as to the hostile work environment claim.

The allegations made by Rodgers, if true, could support a finding of a hostile work environment. Most importantly, she alleges unwanted touching of her body by Owen while at work. R. 14, ¶ 35. Owen admits propositioning Rodgers on numerous occasions and engaging in sexual activity in the office. *See* R. 51, Exh. C, at 110-11, 113, 115, 117-122, 126-32. *See also* R. 51, Exh. A, at 131-36. Although of lesser relevance, Rodgers also points to two remarks made by Owen, one in which he indicated that Rodgers should be "barefoot and pregnant" and the other where he referred to her as a "dumb blonde." R. 56 at 24-25. She likewise alludes to an exchange in which Owen commented on the attractiveness of a female job applicant. *Id.* at 25. She also notes that Owen brought her excessive absenteeism and abuse of the sick

leave policy to the attention of upper management only after she terminated their relationship. *Id.* These incidents, viewed in their totality, could support a finding of hostile work environment. *See Randolph v. Ohio Dept. of Youth Services*, 453 F.3d 724, 734 (2006) (finding a hostile work environment where the plaintiff was "subject to daily threats, derogatory comments, verbal harassment, foul language, and several serious physical assaults to which members of the opposite sex were not exposed"). *But see Clark v. UPS, Inc.,* 400 F.3d 341, 351-52 (2005) (holding that telling vulgar jokes, touching the plaintiff's thigh with a vibrating pager, and pulling at the plaintiff's overalls did not create a hostile work environment).

The defendants also contest whether Rodgers can establish the fifth prong – that the City is vicariously liable. "[A]n employer is vicariously liable 'for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee.'" *Jackson v. Quantex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).[4] Assuming there was a hostile work environment, the next question is whether the plaintiff suffered a "tangible employment action." *See Clark,* 400 F.3d at 348. If there was such an action, the City is automatically liable because Owen was the Superintendent of the Public Works Department, with supervisory authority over Rodgers. *See Clark*, 400 F.3d at 348. However, where a supervisor's harassment does not result in a negative

---

[4]A different standard of proof applies when a plaintiff alleges harassment by a co-worker. *Jackson*, 191 F.3d 659. Although Rodgers alleges in her response to the summary judgment motion that she was "subjected to severe, pervasive, intimidating and physically threatening racial harassment by her co-workers at the City of Elizabethtown" (R. 56 at 28-39), her second amended complaint does not set forth a basis for the City's supervisory liability based on Rodgers's co-workers's sexual or racial harassment (*see generally* R. 14), so the court will not address it.

tangible employment action, employers may raise an affirmative defense.  *Id.*

This court need not decide whether a tangible employment action occurred, as the City has failed to demonstrate that it is entitled to the protections of the affirmative defense. In order to raise the affirmative defense, the City must show by a preponderance of the evidence that (a) it exercised reasonable care to prevent and promptly correct any sexually harassing behavior, and (b) Rodgers unreasonably failed to take advantage of any preventative or corrective opportunities provided by the City or to avoid harm otherwise. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998). The City has failed to do so.

That the City had a sexual harassment policy in place at the time of the alleged harassing conduct is not sufficient to satisfy the first prong of the test. The policy must also be effective in practice.  *Clark*, 400 F.3d at 349.  An effective policy should at least (1) require supervisors to report incidents of sexual harassment, (2) permit both informal and formal complaints of harassment to be made, (3) provide a mechanism for bypassing a harassing supervisor when making a complaint, and (4) provide for training regarding the policy.  *Id.* at 349-50 (citations omitted).  Because the City's harassment policy does not meet these standards, the City cannot successfully raise the affirmative defense, whether or not Rodgers unreasonably failed to avail herself of the policy.

There is evidence that Reynolds posted the City's policy on a bulletin board, but resolving all disputes in a light most favorable to Rodgers, there is evidence that the policy was not widely disseminated or understood. Rodgers had been a City employee for nearly nineteen years when she was fired, but she claimed to be unaware of the

sexual harassment policy. Rodgers Dep. at 29-60. Reynolds admitted that although a sexual harassment policy was included in a handbook he was given upon his hire in 1984, he had not received any further documents or information and had never re-read the handbook. R. 51, Exh. B, at 22-23 (Reynolds Deposition); *see also* R. 51, Exh. C, at 24-26 (Owen Deposition) (noting that he learned about dealing with issues of sexual harassment in the workplace from the policy in the Employee Handbook). The evidence shows that there was no training on the sexual harassment policy or the City's procedures other than a session in 2009, after the EEOC investigation and after the instant lawsuit was filed. R. 51, Exh. B, at 23-26, R. 51, Exh. C, at 22-24. Hence, the City is not entitled to the affirmative defense, and Rodgers's claim for hostile work environment can proceed.

### E. Quid pro quo sexual harassment under the KCRA

Finally, Rodgers alleges that she was subjected to quid pro quo sexual harassment. Quid pro quo harassment "occurs when an employee's submission to unwanted sexual advances becomes either a condition for the receipt of job benefits, or the means to avoid an adverse employment action." *See Howington v. Quality Restaurant Concepts*, 298 F.App'x 436, 441 (6th Cir. 2008). *See also Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998). Because sufficient evidence exists that Rodgers's submission was a condition of receiving job benefits, the defendants' motion for summary judgment will be denied. Fed. R. Civ. P. 56(c).

A plaintiff claiming quid pro quo sexual harassment must show five elements in order to establish a prima facie case. *Stanford v. Main St. Baptist Church Manor, Inc.*,

327 F.App'x 587, 596-97 (6th Cir. 2009). For the purposes of summary judgment, the defendants do not dispute the plaintiff's ability to prove the first three elements. R. 51 at 18.  Therefore, discussion will focus on the final two elements.

The fourth element has not always been stated identically by the Sixth Circuit. Both parties rely on *Stanford* for the proposition that to satisfy the fourth element, Rodgers must establish that "[her] refusal to submit to the unwelcome demands resulted in an adverse employment action." *Stanford*, 327 F.App'x at 597.  However, in several cases, the Sixth Circuit indicated that this element can also be satisfied by showing "that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits."  *See Bowman v. Shawnee State University*, 220 F.3d 456, 461 (6th Cir. 2000); *Prechtel v. Kellogg's*, 270 F.App'x 379, 381 (6th Cir. 2008). This conception appears to have originated in *Highlander v. K.F.C. Nat. Mgmt. Co.*, 805 F.2d 644 (6th Cir. 1986), where the court stated that  "[q]uid pro quo sexual harassment is anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments." *Id.* at 648.

In some ways, *Highlander*'s reading of quid pro quo harassment departs from the narrow conception evinced by the Supreme Court in *Ellerth*. 524 U.S. 742, 751-54. There, the Court described quid pro quo claims as "[c]ases based on threats which are carried out." *Id.* at 751. However, the court also downplayed the presence of sharp distinctions in this area of the law, particularly between quid pro quo claims and hostile

work environment claims. *Id.* Therefore, this court holds that the alternative test first enunciated in *Highlander*, and later reiterated in *Bowman, Prechtel,* and *Howington* remains in effect.

 Rodgers may be unable to meet the test described in *Stanford*. Although the decision to limit her overtime and to terminate her employment do amount to tangible employment actions, and although she has offered evidence that the decision to limit her overtime was made *sometime* after she ended her relationship with Owen, she has provided no further evidence on this point. All she has indicated is that at some point after her refusal, she was denied the ability to work overtime. *Id.* at 140-45. Apart from this rough temporal relationship, Rodgers has given no grounds on which a rational jury could infer a causal relationship.

 However, viewing all evidence in a light most favorable to the plaintiff, and applying the *Bowman  - Prechtel - Highlander* iteration of the standard, a rational juror could find that Rodgers's "submission to the unwelcome advances was an express or implied condition for receiving job benefits."  Owen admitted telling Rodgers that performing their various sexual acts was a part of her job description. *See* Owen Dep. at 115. In addition, Rodgers testified that Owen stated that "if [she] went along with everything he would make things easier on [her] and if [she] didn't, he could make them harder on [her]." Rodgers Dep. at 111. Together, these statements are sufficient for the plaintiff to survive summary judgment on her quid pro quo harassment claim.[5]

---

[5]The defendants are subject to respondeat superior liability, the fifth element of Rodgers's prima facie case. *See Howington*, 298 F.App'x at 441.

### III.    Conclusion

Accordingly, **IT IS ORDERED** that the motion for summary judgment by the City of Elizabethtown, David Willmoth, Jr., in his individual and official capacities, and William Owen, in his official capacity, (R. 50, 51) is **GRANTED** as to the § 1983 free speech claim and the discrimination and retaliation claims, but **DENIED** as to the hostile work environment and quid pro quo harassment claims.

Signed on  November 4, 2010

*Jennifer B Coffman*

**Jennifer B. Coffman, Judge**
**United States District Court**